UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISON

ABDOU BOYE,

        Plaintiff,

                                Civil Case No. 12-CV-12108

v.

                                HON. MARK A. GOLDSMITH

CONNOR CORP.,

        Defendant.

_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Dkt. 58)

### I.  INTRODUCTION

This is a product liability case brought by Plaintiff Abdou Boye against Defendant Connor Corporation.  Plaintiff alleges that Defendant owned a rubber injection mold press from 1995-2007 and modified it, so as to disable the press's safety systems and make the press defective.  Plaintiff further alleges that Defendant sold the press in this defective condition to Plaintiff's employer, Fourstar Rubber, Inc. ("Fourstar") in 2007, and that, when Plaintiff used the press, he was injured.  Specifically, Plaintiff alleges that on October 15, 2010, he suffered a severe injury when his left hand was caught in the press while he was operating the machine at Fourstar's facility in Commerce Township, Michigan.  Plaintiff sustained injuries that lead to the amputation of his left hand.

Now before the Court is Defendant's motion for summary judgment (Dkt. 58).  The matter has been briefed and oral argument was heard on February 13, 2014.  The Court has thoroughly reviewed the motion papers and the evidence attached thereto.  For the reasons set forth below, the Court denies summary judgment to Defendant.

## II.  BACKGROUND

### A.  The Rubber Injection Mold Press

Klockner Desma Elastomertechnik, GmbH, manufactured the press, a rubber injection molding machine, in 1994.  George J. Orphan Report at 2 (Def. Ex. 4).  The press was used to make rubber parts through the cycling of molds.  John H. Hamilton Report at 2 (Dkt. 64-4).  The press operated when an individual pressed a button, which would close two doors on the front of the machine.  Id.  After the doors were closed, the press brought upper and lower halves of a mold together.  Id.  The press then injected liquid rubber into the mold and cured the rubber under pressure and heat; the press had the capacity to generate 250 tons of pressure.  Id.; George J. Wharton Report at 3 (Def. Ex. 5).  When the rubber was cured, the molds separated and the front doors opened, allowing an individual to retrieve the finished rubber parts by hand.  Hamilton Report at 2.

The press had safety features designed to protect the individuals who operated it.  The safety features that related to the front doors were "pressure sensitive strips" and "limit switches."  Id. at 2-3.  The pressure sensitive strips (also called "safety strips" or "strips") were located on the outer edge of the doors and contained an electronic sensor connected to the press's computer.  Id. at 3.  If the strips sensed an obstruction before the doors fully closed, the sensor would send a signal to the press's computer, which would command the front doors to retract and prevent the press from working further.  Id.; see also Orphan Dep. at 59 (Dkt. 64-2).

The press also had "limit switches" (alternatively referenced as "safety gates"), which sensed the position of the front doors.  Hamilton Report at 2.  Like the strips, the limit switches were connected to the press's computer.  Richard Hooper Report at 3-4 (Dkt. 64-5).  When the front doors fully closed, the limit switches were triggered and permitted the press to operate.

Hamilton Report at 2-3.  If the front doors did not fully close, the limit switches were not triggered, causing the doors to re-open and the press to stop.  Id.

Lastly, the press also had a hydraulic safety valve, which controlled a pump for the press's hydraulic systems.  Wharton Dep. at 30 (Dkt. 64-3).  If the doors of the press were open, the hydraulic safety valve would turn off the pump for the hydraulic system.  Id.

### B.  Ownership of the Press by Defendant and Fourstar

Desma USA, Inc. ("Desma") sold the press new to Defendant in Ft. Wayne, Indiana in 1995.  See 1995 Purchase Agreement (Def. Ex. 1).  Defendant used the press until 2007.  During the time Defendant owned the press, it maintained the press both in-house and through Desma-authorized service technicians.  Def. Br. at 1.  In 2007, Defendant sold most of its manufacturing equipment, including the press relevant to this case and a second press of the same model.  Id.

Defendant sold the two presses to Fourstar for $20,000, on December 7, 2007.  In making the sale, Fourstar's owners — Dan Voros Sr. and Rosemary Voros — corresponded with Defendant's Vice President Jack Lawson via email:

> Jack---FourStar Rubber would like to offer $10,000.00 each for the DESMA injection machines [Defendant] presently has for sale.  This offer is for all components that complete each machine--Please as soon as possible.
> Thanks Rosie and Dan---FourStar Rubber

12/7/07 Email from Fourstar to Defendant (Def. Ex. 2).

Lawson responded to Fourstar's offer as follows, in pertinent part:

> Rosie and Dan,
> Your offer of $10,000 per machine ($20,000 total) has been accepted with the understanding that said equipment has been sold to you "as is where is" and that any and all costs of removal, transportation and re-installation shall be borne by you, the buyer. Further, it shall also be understood that all auxiliary components of said equipment shall be considered sold as well.

3

       \* \* \*

Once we are in receipt of your payment, please contact Dave Tester with respect to the equipment removal. Should you have any questions in the meantime, please feel free to contact either Dave or myself . . . .

Many thanks and take care.
Jack Lawson

12/7/07 Email from Defendant to Fourstar (Def. Ex. 2).

After the sale, Fourstar had the machines transported from Indiana to its facility in Michigan. Voros Sr. Dep. at 20 (Dkt. 64-20). According to Dan Voros Sr., he and two of his employees — Scott Lamb and Bob Myers — set up the presses and made them operational. Id. at 21, 56.

### C. Plaintiff's Injury in Using the Press

Approximately two-and-a-half years later, Plaintiff began working at Fourstar, in July 2010. On October 15, 2010, Plaintiff was operating the press. At one point, Plaintiff was in the process of removing rubber from the press with his left arm in the machine. The press began to cycle and trapped Plaintiff's left hand in the mold. Michigan Occupational Safety and Health Administration ("MIOSHA") Report (Def. Ex. 11). The press crushed and burned Plaintiff's hand to the extent that amputation of the hand between the wrist and elbow was necessary. Id.

Following Plaintiff's injury, MIOSHA conducted an investigation of the accident and inspected the press. Id. The MIOSHA investigator interviewed Plaintiff and Plaintiff's supervisor, Scott Lamb. Id. According to the MIOSHA report field narrative, Plaintiff told the investigator that the press "frequently wouldn't open or close." Id. at cm/ecf Pg ID 603. Furthermore, Plaintiff "[w]as purging rubber from mold when gate closed on arm and then mold closed on hand. Not sure if cycle switch was activated rather than purge switch." Id. In

deposition, Plaintiff reiterated his uncertainty of how the press was activated.  Pl. Dep. at 57 (Dkt. 64-10).

As for Lamb, the MIOSHA report recounts that Lamb went to Plaintiff after hearing him scream and found that Plaintiff's "left hand was caught between the mold.  The safety gate was open with the mold closed."  MIOSHA Report at cm/ecf Pg ID 602.  Lamb also stated that the "limit switches on the safety gate are suppose [sic] to prevent mold from closing if gate is not completely closed.  [Plaintiff] had a piece of cardboard in his left hand suggesting he was purging rubber when mold closed.  Uncertain why mold would close with gate partially open.  Could not find a mechanical fault."  Id.

In addition to the MIOSHA investigation, several witnesses testified about the press. Defendant's former General Manager, Heather Foley, testified regarding safety features.  Foley stated that she did not perform maintenance on the presses, and that she did not have "specific knowledge of anything" regarding the press.  Foley Dep. at 100, 102 (Dkt. 64-19).  As far as Foley was concerned, "the safety features were fully functioning" while the presses were at Defendant's facility.  Id. at 102.

David Tester, who worked at both Defendant and Fourstar as an engineer, also testified. Tester worked for Defendant for approximately 20 years, until March 2008.  Tester Dep. at 10-12 (Dkt. 64-18).  Tester also worked for Fourstar from April 2008 to November 2009.  Id. at 12. Tester explained that his duties included maintaining the press.  Tester stated that he never altered the safety features on the press or modified the press's software.  Id. at 91, 109.  Tester also stated that, while at Defendant, he or other maintenance people may have adjusted the limit switches in instances where the doors of the press would not have closed.  Id. at 171.

From early 2008 to March 2010, Bob Myers worked at Fourstar, performing maintenance on the company's machines.  Myers testified that he alone set up the presses at Fourstar.  Myers Dep. at 36 (Dkt. 64-12).  According to Myers, he did the work to bring the press online, but Dan Voros Sr. oversaw him.  Id. at 37.  Myers explained that when he began to set up the press for Fourstar, there was only wear on the top side of the safety strips, and that they were not "cut through," as depicted in the photographs of the press after the accident.  Id. at 49.  Myers also observed that the press had a preexisting electrical bypass because the front door safety strips were inoperative and disconnected.  Id. at 49-53.  Normally, if the strips were inoperative, the press would not work.  However, the press in this case worked, despite the strips being inoperative.  Myers did not repair or replace the strips because he believed that the limit switches, if triggered, would cause the front doors to open and stop operation of the press if an obstruction was encountered.  Id. at 51-53.

Prior to the accident, Myers replaced the lower strip rubber component on the press, which was confirmed by Voros Sr., but Myers did not make the electrical connections needed to make the strips operational.  Id. at 54-58; Voros Sr. at 57-58 (Dkt. 64-20).  Myers, however, stated that he did not know which press he was working on when he replaced the strip.  Id. at 54 ("I only replaced the rubber bumper on the bottom of one of the machines, I can't tell you exactly which machine it was.").  It is not apparent from the maintenance log for the press that is the subject of this litigation that there is an entry regarding the replaced strips.  See Fourstar Maintenance Log (Dkt. 64-14).  Myers testified that he was unaware of any maintenance on the press not included in the log.  Myers Dep. at 89.

With the exception of the front door strips, Myers was unaware of any safety bypass during his tenure at Fourstar.  Id. at 30.  Although Myers testified that he did not bypass safety

6

features of the press, he performed other work on the press prior to the accident because Fourstar "always had lots of problems with the machines, and it was more so trying to get the safety functions to work properly so we could continue to have the machine running." Id. at 64. For example, Myers stated that he replaced the transducers for the limit switches. Id. at 28. The maintenance log reflects Myers's efforts as he performed work regularly in 2009 and 2010. See Maintenance Log; Myers Dep. at 85-89 (explaining maintenance procedures). Myers left Fourstar in March 2010, prior to Plaintiff's employment at Fourstar; consequently Myers did not know Plaintiff. Id. at 118.

With regard to other modifications of the press, Fourstar's general manager, Dan Voros Jr., stated that he once modified the software to bypass a broken limit switch on the rear door. Voros Jr. Dep. at 10-11 (Dkt. 64-21). Although he did not remember when he altered the software, Voros Jr. spoke with a Desma technician about a problem with the press. The technician diagnosed the problem for him, explaining that the press was not running because of a tripped limit switch. Id. at 11. Voros Jr. could not recall what the Desma technician told him to do exactly. Id. at 12. However, Voros Jr. decided to turn off the limit switch in order to make the press work. Id. at 13-14. Voros Jr. understood that his alteration of the software did not affect the front doors and did not play a part in the accident. Id. at 15-16.

Dan Voros Sr. testified that once the press was at Fourstar's facility, he set it up with Scott Lamb and Bob Myers. Voros Sr. Dep. at 56. Voros Sr. stated that he, Lamb, Myers, and Tester were the ones to maintain the press. Id. at 34-35. He also stated that his son, Voros Jr., would "help" the others work on the press. Id. at 63-64. Voros Sr. believed that the safety features on the press worked as intended, and that some part of the press was replaced at some

time, but he was unsure which component.  Id. at 57 (stating that "[I] know we replaced something on the side, you know, but that's the only thing I know").

The record also includes a "Service Engineer Report" from "KP Sales and Service, Inc." of Erlanger, Kentucky, authored in June 2000.  The report states that the "[s]afety gates on rear of press are missing plexiglass and front bumper strips are damaged & need replaced [sic]. These are safety issues that need to be corrected immediately."  6/21/00 Report (Dkt. 64-15).

The record further contains reports from the parties' experts.  The reports generally conclude that the strips' failure and re-wiring contributed to the accident, but the experts differ as to when these changes were made to the machine.  For instance, one of Plaintiff's experts, John Hamilton, a mechanical engineer, opined that "if the safety [strips] had been functioning correctly and connected at the time of this incident, that the accident would not have happened." Hamilton Report at 12.  Hamilton did not opine who made the changes or when they were made. See id.  Hamilton also observed that the electrical bypass concerning the strips was done with a "diode" to essentially trick the machine into thinking that the strips were operating normally.  Id. at 8.  Hamilton stated that the strips were not disabled due to use, but because someone with technical skill intentionally made the connection.  Id. at 8-9.

Plaintiff's response also includes the opinions of Richard Hooper (Dkt. 64-5) and Michael Kelly (Dkt. 64-6).  Hooper, a software engineer, opined that the press's software had not been modified since 1995, and that the changes to the press's hardware deceived the press's software.  Hooper Report at 4-11.  Kelly, an electrical engineer, opined that the combined changes to the press made it dangerous.  Kelly Report at 14.  These changes included (i) limit switches that were "not functional," (ii) intentional re-wiring and mechanical defeat of the

hydraulic safety valve, (iii) modifications to the strips, (iv) changes to the "emergency stop circuit," and (v) the press's "extremely poor maintenance." Id.

Defendant's expert, George Orphan, stated that the "physical electrical elements and wiring of the [strips] were changed on the subject press in order to deceive and defeat the safety programming" of the press's software. Orphan Report at 4. Orphan did not state that the failure of the strips alone contributed to the accident. In deposition, he explained that the other modifications of the machine, including the re-wiring and the modifications to the limit switches may have contributed to the accident. Orphan Dep. at 57-59 (Dkt. 64-2). Orphan believed that the changes to the machine were "recent." Orphan Report at 4.

**D. Procedural Background**

Plaintiff filed the instant suit in 2012, naming Desma and Defendant as defendants in a six-count complaint. Compl. (Dkt. 1). In November 2013, Plaintiff voluntarily dismissed his claims against Desma. 11/12/13 Order (Dkt. 59). Plaintiff's remaining claims asserted against Defendant are (i) breach of implied warranty of fitness, (ii) breach of express warranty, (iii) negligence, and (iv) gross negligence. Compl. ¶¶ 25-51.

### III. SUMMARY JUDGMENT STANDARD

When a defendant seeks summary judgment, the defendant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quotation marks omitted). When reviewing a motion for summary judgment, the Court "must view the evidence and any inferences that may be drawn from the evidence in the light most favorable to the nonmoving

9

party." Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). If the moving party meets its burden, the opposing party "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita, 475 U.S. at 587. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Redding, 241 F.3d at 532 (quotation marks omitted).

## IV. ANALYSIS[1]

Defendant contends that there is no question of material fact regarding (i) implied warranty, (ii) proximate cause, (iii) express warranty, or (iv) gross negligence. See Def. Br. at 7-18. The Court rejects all of Defendant's arguments.

### A. Implied Warranty & Negligence

Plaintiff asserts, inter alia, claims for implied breach of warranty (Count I) and negligence (Count III). Compl. ¶¶ 25-31, 40-43. Michigan law requires that a negligence claimant establish the failure of due care by defendant. Croskey v. BMW of N. Am., Inc., 532 F.3d 511, 520 (6th Cir. 2008). The same is true where the action is based on breach of implied warranty by a non-manufacturing seller:

---

[1] Although not disputed by the parties, subject-matter jurisdiction in this case is predicated upon diversity jurisdiction and, therefore, the Court applies Michigan law. CenTra, Inc. v. Estrin, 538 F.3d 402, 409 (6th Cir. 2008).

10

> In a product liability action, a seller other than a manufacturer is not liable for harm allegedly caused by the product unless either of the following is true:
> (a) The seller failed to exercise reasonable care, including breach of any implied warranty, with respect to the product and that failure was a proximate cause of the person's injuries.
> (b) The seller made an express warranty as to the product, the product failed to conform to the warranty, and the failure to conform to the warranty was a proximate cause of the person's harm.

Mich. Comp. Laws § 600.2947(6). As Michigan courts have recognized, these sections "clearly and unambiguously predicate product liability on a non[-]manufacturing seller for harm allegedly caused by the product under only two scenarios: (a) where the seller fails to exercise reasonable care, or (b) where there is a breach of an express warranty." Curry v. Meijer, Inc., 780 N.W.2d 603, 606 (Mich. Ct. App. 2009). The statute, therefore, limits "a non-manufacturer seller's liability whether a plaintiff sues under a negligence standard or an implied warranty standard." Jacobs v. Tricam, 816 F. Supp. 2d 487, 495-496 (E.D. Mich. 2011) (citing Croskey, 532 F.3d at 520).

## 1. Breach of Reasonable Care

Defendant argues that the record does not disclose a genuine issue of material fact regarding a breach of implied warranty. Defendant "does not dispute that a genuine issue of fact supporting either [a] negligence or breach of implied warranty claim could be supported by credible evidence [Defendant] modified or bypassed one of the safety systems on the subject press." Def. Br. at 10 (emphasis in original). According to Defendant, none of its employees admitted to making "modifications of any safety system," and Tester lacked knowledge to bypass a safety system or modify the software. Id. Defendant posits that Fourstar employees made the press unsafe, particularly Myers because he did not restore the safety strips' wiring. Id.

at 11-12. Defendant notes that none of the experts could conclude who modified the safety strips. Id. at 12.

In response, Plaintiff argues that sufficient direct and circumstantial evidence exists in the record to create a genuine issue of material fact regarding a failure to exercise due care. Pl. Br. at 4-14. Plaintiff highlights that (i) there is no dispute that the press had been modified, (ii) Myers testified that the safety strips were modified prior to Fourstar obtaining them, (iii) a maintenance report from 2000 shows that the safety strips were damaged, (iv) Tester stated that he had tinkered with the limit switches, (v) Foley testified that she lacked particular knowledge of modifications, (vi) Fourstar employees testified that they did not make modifications to the safety systems, and (vii) Defendant did not produce documentation, such as maintenance logs, regarding the press while at Defendant's facility. Id. at 4-12. For the reasons set forth below, the Court agrees with Plaintiff that there is a genuine issue of material fact whether Defendant failed to exercise reasonable care regarding modifications to the safety systems of the press.

As stated above, Michigan law only holds non-manufacturing sellers liable if they fail to exercise reasonable care, including breach of any implied warranty, with respect to the product. Mich. Comp. Laws § 2947(6); see also Croskey, 532 F.3d at 520 (holding that a plaintiff must "show that [i] the product was sold in a defective condition, [ii] the defect caused his injury, and [iii] the seller failed to exercise reasonable care" (emphasis is original)). "To demonstrate that a defendant failed to exercise reasonable care," courts evaluate "whether a plaintiff demonstrated that the defendant knew or should have known of the defect." Kraft v. Dr. Leonard's Healthcare Corp., 646 F. Supp. 2d 882, 888 (E.D. Mich. 2009); Konstantinov v. Findlay Ford Lincoln Mercury, 619 F. Supp. 2d 326, 332 (E.D. Mich. 2008) (holding that "non-manufacturing sellers can be held liable for breach of implied warranty only if it is shown that they failed to exercise

reasonable care, that is, that they knew or had reason to know of the alleged defect"). Here, there is a genuine issue of material fact regarding whether Defendant breached an implied warranty by failing to exercise reasonable care in connection with the safety strips. Croskey, 532 F.3d at 520.

As an initial matter, the Court notes that Defendant states that "a genuine issue of fact supporting either [a] negligence or breach of warranty claim could be supported by credible evidence [Defendant] modified or bypassed one of the safety systems of the subject press." Def. Br. at 10 (emphasis in original). However, it is elementary that, on a motion for summary judgment, courts "do not weigh the evidence or make credibility determinations." Selby v. Caruso, 734 F.3d 554, 559 (6th Cir. 2013). The Court interprets Defendant's statement to mean that it agrees that defeating the redundancy of the safety systems would constitute a failure to exercise reasonable care.

As regards the state of the press, going back to as early as 2000, a technician report indicates that the strips were damaged and needed to be replaced. 6/21/00 Report (Dkt. 64-15). Defendant also stated that it could not locate any service or maintenance logs for the press. Def. Answers to Pl. Interrogs. At 7 (64-22). Foley, Defendant's plant manager, stated that she had no actual knowledge of whether the press was modified. Foley Dep. at 100, 102. Tester, the other employee of Defendant who testified regarding the press, stated that some parts of the strips were replaced during his tenure at Defendant, but he could not remember when. Tester Dep. at 97.

The record discloses that Myers found that the strips were disabled and bypassed when he assembled the press soon after it was purchased from Defendant by Fourstar. Myers Dep. at 49-53. No other employee of Fourstar testified that he or she altered the strips. Additionally, Tester stated that, during his time at Fourstar, he did not modify or bypass the strips and did not know

13

how to do so.  Tester Dep. at 91.  Tester stated he was unaware of any alteration of the machine during his time at Fourstar.  Id. at 94.

Taking the facts in the light most favorable to Plaintiff, the Court concludes that there is a genuine issue of material fact regarding whether Defendant sold the press in a defective condition concerning the strips and whether Defendant knew or should have known about this defect.  Croskey, 532 F.3d at 520.  Given that the press was designed to be inoperable if the strips were disabled, and that the press apparently still functioned when it was assembled at Fourstar, there is a genuine issue of material fact whether Defendant knew or should have known of the defect affecting the safety systems.  Kraft, 646 F. Supp. 2d at 888.

Additionally, the Court finds that there is a genuine issue of material fact regarding the functionality of the limit switches when Defendant sold the press to Fourstar.  Tester stated that he may have modified the limit switches:

> Q. Okay. Did you, while you were at Connor, ever — ever do anything, adjust or — or otherwise tinker with those limit switches?
> A. Not me, not myself.
> Q. Okay.  People at Connor did that, though, didn't they?
> A. They may have.
>  Q. And who was it that may have done that?
> A. Maybe me. That's people.
> [Def. Counsel]: Well, and let's be more precise. I guess now I object to the form of "tinker."  If you could be a little more precise, I would appreciate it.
> [Counsel for Desma]: Okay, sure.
> Q. (By [Counsel for Desma]) Maintenance people at Connor, what — what did they do to the limit switches?
> A. They would have to adjust them to make sure that — if the door didn't close, they would have to adjust them to make the limit switch.
> Q. Okay. And when we're talking about the door, you're talking about the gate at the front?
> A. Correct, or any other door or gate on there.
> 　　　　　　　* * *
> Q. Okay. You never did anything with those switches when you were at Connor?

14

A. No.

Tester Dep. at 171-172.  From Tester's testimony, it is unclear what he did when he worked on the limit switches.

As for other employees at Fourstar, no one testified that he or she altered the limit switches.  See, e.g., Lamb Dep. at 59 (Lamb never worked on the limit switches); Rosemary Voros Dep. at 30-32 (Dkt. 64-13) (stating that she was unaware of any safety issues); Voros Sr. Dep. at 34 (Dkt. 64-20) (disclaiming any knowledge about the limit switches); Voros Jr. Dep. at 52-53 (Dkt. 64-21) (professing no knowledge regarding limit switches or other modifications to the press's safety systems).  And Myers thought the press was safe because the safety features of the press — including the limit switches — were operational.  Myers Dep. at 58-60 (describing how Myers tested the limit switches of the machine and found them to be operational and safe).

Considering the evidence, in a light most favorable to Plaintiff, that (i) the limit switches were modified to some extent by Tester while he was at Defendant, (ii) Fourstar's employees claim that they did not work on the limit switches, and (iii) Defendant may have rendered the strips defective, the Court concludes that there is a genuine issue of material fact regarding whether Defendant breached its duty to exercise reasonable care.  Assuming that the press had disabled safety features, a genuine issue of material fact exists whether Defendant, a non-manufacturing seller, should have known about these alleged defects because the press should not have worked.  Konstantinov, 619 F. Supp. 2d at 332.

### 2.  Proximate Cause

With respect to proximate cause, Defendant argues that, under Skinner v. Square D Co., 516 N.W.2d 475 (Mich. 1994), "Plaintiff has failed to produce any credible, admissible evidence that [Defendant] deliberately altered any safety mechanisms or should have known they were

15

compromised at the time of the sale to Fourstar." Def. Br. at 17. According to Defendant, all the evidence indicates that Fourstar modified the press. Id. In response, Plaintiff asserts that Defendant's argument is derivative of its argument regarding breach. Pl. Br. at 17-18. Plaintiff argues that the changes to the press proximately caused Plaintiff's injuries, as supported by experts for both Defendant and Plaintiff. Id. at 18-19. Lastly, Plaintiff argues that the kind of injury he suffered, a "pinch point injury," is the kind of injury the safety features were supposed to prevent. Id. at 20.

Under Michigan law, a plaintiff must show that the "failure was a proximate cause of the person's injuries." Mich. Comp. Law § 600.2947(6). As the Sixth Circuit has explained, "[p]roving proximate cause actually entails proof of two separate elements: (1) cause in fact, and (2) legal cause, also known as 'proximate cause.'" Irwin v. Odyssey Contracting Corp., 61 F. App'x 150, 153 (6th Cir. 2003) (quoting Skinner, 516 N.W.2d at 481). The cause-in-fact element is "that which produces injury and without which such injury would not have occurred." Id. (ellipsis and quotation marks omitted). The legal cause or proximate-cause element "normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." Id. (quotation marks omitted).

Here, the Court agrees with Plaintiff that Defendant has failed to carry its burden at the summary judgment stage. Although Defendant's brief contains a section labeled "proximate cause," Def. Br. at 14-17, and Defendant regurgitates the standard for proximate cause, see id. at 15-16 (extensively block quoting Skinner), Defendant's argument, as observed by Plaintiff, reiterates Defendant's breach argument. See Def. Br. at 17 (arguing the lack of "credible" evidence that Defendant "altered" the press and mentioning the evidence that Fourstar modified the press).

16

At the summary judgment stage, Defendant has the burden to inform the Court of the basis for its motion and to identify evidence that Defendant believes demonstrates the absence of a genuine issue of material fact.  Celotex, 477 U.S. at 323.  As explained above, the Court has already rejected Defendant's arguments concerning the exercise of reasonable care and such arguments have no more force here in relation to proximate cause.  Furthermore, by failing to explain the basis why no material fact issue exists for proximate cause under the appropriate standard, Defendant has not carried its burden.  Id.; see also Rivet v. State Farm Mut. Auto. Ins. Co., 316 F. App'x 440, 449 (6th Cir. 2009) (refusing to address "arguments that . . . are unsupported or undeveloped").  Therefore, the Court will deny Defendant's motion with regard to the proximate cause.

Accordingly, the Court denies Defendant summary judgment on Plaintiff's implied warranty and negligence claims.

### B.  Express Warranty

In Count II of the complaint, Plaintiff asserts a claim for express warranty.  Compl. ¶¶ 32-39.  Defendant raises the defense that it never made an express warranty to Fourstar in selling the press.  Def. Br. at 13-14.  Defendant argues that the transaction over email, including the "as is where is" clause, contained all the relevant terms of the sale.  According to Defendant, Voros Sr., on behalf of Fourstar, agreed to the terms and did not believe there was any warranty on the presses.  Id. at 13.  Defendant also asserts that Tester denies being involved in the sale of the presses, so Voros Sr. could not rely on his representations about the machines.  Id.  Defendant states that no express warranty was made because Voros Sr., Myers, and Tester believed the machines were running safely.  Id. at 14.  Additionally, Defendant points out that, once Myers discovered that the strips were not working properly and did not fix them, an express warranty

17

could not be breached.  Id.  The only authority Defendant marshals is a terse cite to Michigan's

civil jury instructions.  Id. (citing "M Civ JI 25.11 and 25.12").

Like Defendant's argument concerning proximate cause, the Court determines that

Defendant has failed to carry its burden at the summary judgment stage to inform the Court of

the basis for its motion and to identify evidence for the Court that Defendant contends evinces

the lack of a dispute concerning material facts.  Celotex, 477 U.S. at 323.  Although Defendant

cites to evidence, Defendant has not cited to any substantive authority concerning express

warranties.  See, e.g., Kraft, 646 F. Supp. 2d at 890 (analyzing the existence of express warranty

under Mich. Comp. Laws § 440.2313).  Defendant has failed to inform the Court of the basis for

its motion and summary judgment is, therefore, not warranted.   Celotex, 477 U.S. at 323; see

also Griffin v. Sanders, No. 11-CV-12289, 2013 WL 3788826, at *20 (E.D. Mich. July 19, 2013)

(denying summary judgment to defendants who failed to address a basis in their brief).

Accordingly, the Court will deny Defendant's motion with regard to Plaintiff's express

warranty claim.

### C.  Gross Negligence

In Count IV of the complaint, Plaintiff asserts a claim for gross negligence.  Compl. ¶¶

44-51.  Defendant attacks this count, but does not make a distinct argument regarding gross

negligence.  Def. Br. 17-18.  Instead, Defendant "incorporates by reference" its warranty and

negligence arguments.  Id. at 18.  Defendant's mere incorporation by reference to its arguments

concerning Plaintiff's implied warranty and negligence claims is insufficient, see Def. Br. at 17-

18 (citing the lack of "credible" evidence), because these arguments have already been rejected

by the Court.  Additionally, Defendant provides no legal authority, aside from a short recitation

of the standard for gross negligence, to support its argument.  Id. (citing Mich. Comp. Laws §

18

600.2945(d) ("Gross negligence' means conduct so reckless as to demonstrate a substantial lack of concern for whether injury results.")).  Therefore, without additional reasons, the Court holds that Defendant has failed to meet its burden on summary judgment for Plaintiff's claim for gross negligence.  Celotex, 477 U.S. at 323; Griffin, 2013 WL 3788826, at *20.

Accordingly, the Court denies Defendant summary judgment on Plaintiff's claim for gross negligence.

## V.  CONCLUSION

For the reasons stated above, the Court denies Defendant's motion as to all of Plaintiff's claims.

SO ORDERED.

Dated:  July 2, 2014                           s/Mark A. Goldsmith
    Flint, Michigan                      MARK A. GOLDSMITH
                                     United States District Judge

### CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 2, 2014.

                                  s/Deborah J. Goltz
                                  DEBORAH J. GOLTZ
                                  Case Manager